UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division



UNITED STATES OF AMERICA

v.

ZACHARY RYAN STEIN,

    Defendant.

CRIMINAL NO.: 2:21-cr-00067

*MEMORANDUM OPINION AND ORDER*

Before the Court is Zachary Ryan Stein's ("Defendant") Motion to Suppress evidence of a two-ounce bag of methamphetamine that Virginia Beach Police recovered from Defendant's hotel room on February 20, 2021. The Court has reviewed the parties' pleadings and held a hearing on the matter. For the reasons stated below, Defendant's Motion to Suppress is **DENIED**.

## I. PROCEDURAL HISTORY

Defendant filed the instant Motion to Suppress ("Motion") on September 27, 2021. Def.'s Mot. to Suppress, ECF No. 15. The United States of America ("Government") filed a memorandum in opposition to the Motion on October 22, 2021. Gov't's Mem. in Opp'n, ECF No. 23. Defendant filed a reply to the Government's response on October 28, 2021. Def.'s Reply, ECF No. 26. On January 20, 2022, the Court held a hearing on the matter. Note, ECF No. 37; Hearing Transcript ("Tr."), ECF No. 38. At the conclusion of the hearing, the Court stated from the bench that it would deny Defendant's Motion and issue this Memorandum Opinion and Order explaining its reasoning. Tr. at 74:14–75:6.

## II.   FACTUAL FINDINGS

At approximately 10:39 a.m. on February 20, 2021, the Virginia Beach Police Department ("VBPD") responded to Room 423 at the Hampton Inn (5793 Greenwich Road, Virginia Beach, Virginia 23462) to assist with a rescue call. Tr. at 5:2–6:8. The hotel staff reported that there was an unconscious male (Defendant) in Room 423 with three unsupervised children. Tr. at 5:2–6:8, 9:20–23. Room 423 was one of two rooms at the hotel registered to an individual named H.S. Tr. at 50:2–12. Hotel staff made several attempts to wake Defendant but were unsuccessful. Tr. at 5:2–6:8, 9:20–23.

Officer N. Astin was the first VBPD officer to arrive at the scene in Room 423. Tr. at 6:9–11. He entered the room with hotel staff and observed Defendant lying on the couch while three children (all under the age of 6) moved about the room. Gov't's Ex. 1A–Officer Astin's Body Camera Footage ("Gov't's Ex. 1A") at Timestamp ("TS") 2:30; Tr. at 34:2–10. Officer Astin attempted to wake Defendant, but Defendant remained largely unresponsive. *Id.* Upon entering the room, Officer Astin observed an acetylene torch in the bathroom; two "meth pipes" (or clear-glass smoking devices) in front of the television; and a small, black scale on a footrest. Tr. at 12:3–11. Believing that these items were indicative of narcotics use or there being other items in the room that could harm the children, Officer Astin requested that hotel staff remove the children from the room. Tr. at 12:1–13:18; Gov't's Ex. 1A at TS 5:45. Officer Astin explained to hotel staff that there were "narcotics and stuff all in . . . [the] room." Gov't's Ex. 1A at TS 6:26. At the time hotel staff removed the children from the room, one child was without a shirt. *Id.* at TS 6:05. The other two children were fully clothed. *Id.*

Shortly thereafter, Virginia Beach Emergency Medical Services ("EMS") personnel entered the room and tended to Defendant. *Id.* at TS 6:40. As EMS was lifting Defendant onto a

2

stretcher, Defendant became responsive. *Id.* at TS 8:20. At approximately 10:46 a.m., as Defendant was being wheeled out of the room on a stretcher, Officer Astin informed the medics and other officers who were waiting in the hallway that the room was "frozen." *Id.* at TS 9:09; *see also* Tr. at 10:4–9 (explaining the correlation between the timestamp on VBPD body camera footage and Eastern Standard Time). One paramedic responded, "Yeah, we're . . . we're outta here." Gov't's Ex. 1A at TS 9:09. At approximately 10:47 a.m., Officer Astin instructs the other officers to "make sure no one comes in or out of here" in reference to Room 423. *Id.* at TS 9:25.

Officer Astin then followed Defendant and the paramedics out of the building, where the paramedics loaded Defendant into an ambulance at approximately 10:49 a.m. *Id.* at TS 9:30. Once in the ambulance, the paramedics continued treating and questioning Defendant. *Id.* at TS 12:05. Officer Astin was present in the ambulance during the questioning. *Id.* While asking Defendant about his drug history and whether he engaged in any drug use in the hotel room, the paramedics indicated to Defendant that they found drugs and/or drug-related items in the hotel room. *Id.* at TS 13:28 (paramedic stating, "I want to be upfront with you, we saw stuff in the room . . . so . . . if you used anything, just let us know so we can let the doctor come, okay?"). Defendant denied using any drugs in the hotel room repeatedly but admitted to using "everything under the sun at some point." Gov't's Ex. 1A at TS 12:45.

Meanwhile, at approximately 10:47 AM, Officer S. Beaton and Officer T. Buckham entered Room 423 after the room was frozen to find a shirt for one of the children who was being held with his siblings in a laundry room across the hall from Room 423. Gov't's Ex. 2A at TS 4:20. While they were searching the room for a shirt, Officer Beaton stated, "I just don't want to manipulate anything . . . ," and Officer Buckham immediately responded with a shirt in hand, "Got this. This was right on top." *Id.* at 5:06. Both officers then exited the room, and Officer

3

Buckham delivered the shirt to the child. *Id.* While officer Buckham was handing the shirt to the child in the laundry room, Officer Beaton re-entered Room 423 for about 10 seconds, then exited. *Id.* at TS 5:16. The child rejected the shirt Officer Buckham found, and both officers entered the room again at approximately 10:49 AM to find the exact shirt the child requested. *Id.* at TS 5:38. Shortly thereafter, while the officers were still in the room, a hotel staff worker entered Room 423, and Officer Beaton asked her to leave because they were "securing the scene." *Id.* at TS 6:08. At approximately 10:50 AM, both officers exited the room but did not have another shirt for the child. Gov't's Ex. 2A at TS 6:36. At approximately 10:51 AM, Officer Beaton commented to Officer Buckham, "There's a big shard in there. Ya see that?" *Id.* at TS 7:35. Officer Beaton made this comment in reference to the two-ounce bag of methamphetamine behind the TV in the room. Tr. at 37:21–38:17.

At approximately 10:56 a.m., Officer Astin began questioning Defendant in the ambulance about his stay in the hotel. Gov't's Ex. 1A at TS 18:41. Defendant stated that he was paying H.S. to stay in Room 423. *Id.* Officer Astin then asked Defendant about the "pipes" and "acetylene torch" he observed in Defendant's room. *Id.* at TS 19:34. Defendant stated that he was not "involved" with anything Officer Astin observed. *Id.* In response to Officer Astin asking Defendant for consent to search the room, Defendant responded, "I don't consent to searches." *Id.* at TS 19:40. Officer Astin then explained to Defendant that while Defendant has a right to deny the VBPD consent to search the room, the VBPD can apply for a search warrant based on what they observed and search the room anyway if the warrant is approved. *Id.* In explaining this process to Defendant, Officer Astin stated, "I have to freeze the scene based on what I've seen. I have to go type up an affidavit and apply for a search warrant through the magistrate. And if I get the search warrant, I'm going to search the room anyway . . . *if* I get the search warrant." *Id.*

(emphasis in original audio). After hearing Officer Astin's explanation, Defendant denied consent a second time. Gov't's Ex. 1A at TS 20:17. Officer Astin then informed Defendant that he was being "detained" for a "criminal investigation." *Id.* The paramedic told Defendant that since he did not want to be transported to the hospital, he would need to sign a release. *Id.* Defendant responded, "F--- it man, if I'm going to jail [then] take me to the hospital" and laughed. *Id.* at TS 20:50. Defendant reiterated that he was "good' and did not wish to be transported. *Id.*

At approximately 11:00 a.m., Officer Astin provided Defendant's information to the dispatcher. *Id.* at TS 22:30. At approximately 11:01 a.m., the dispatcher reported to Officer Astin that Defendant was on probation. Gov't's Ex. 1A at TS 23:50. Officer Astin asked Defendant for what offense he was on probation. *Id.* Defendant responded, "P.W.I.D." (possession with intent to distribute). *Id.* Officer Astin asked Defendant what he was selling. *Id.* Defendant responded, "Meth" (methamphetamine). *Id.* Officer Astin asked the defendant whether there was "gonna be more meth in the room," and Defendant responded, "Not of mine." *Id.* At approximately 11:08 a.m., Officer Astin removed Defendant from the ambulance and placed him in handcuffs. Gov't's Ex. 1A at TS 30:55. Officer Astin then placed Defendant in the back of Officer Buckham's police vehicle. *Id.*

At approximately 11:12 a.m., Officer Astin returned to Room 423 where several other police—including Sergeant Coffrin, Officer J. Santos, Officer T. Buckham, and Officer Beaton—were walking out of Room 423. *Id.* at TS 33:50. The officers informed Officer Astin of a clear plastic bag containing a large quantity of suspected methamphetamine that was sitting behind the television in Room 423. *Id.*

5

Shortly before 12:00 p.m., Homeland Security Investigations Special Agent George Fox and Task Force Officer Tammy Regan responded to the Hampton Inn. Tr. at 47:22–25, 48:21–49:20. Defendant was moved from a marked VBPD vehicle to an unmarked government vehicle parked in the lot outside the Hampton Inn. Tr. at 51:10–15. At approximately 12:15 p.m., Special Agent Fox advised Defendant of his Miranda rights and confirmed that Defendant understood his rights. Gov't's Ex. 3A at TS 00:13; Tr. at 53: 16–18.

Special Agent Fox asked Defendant when he started using heroin, and Defendant responded "Never." Gov't's Ex. 3A at TS 1:16. Special Agent Fox asked Defendant if he had a medical condition that caused him to pass out, and Defendant replied that he had Kawasaki disease, an artery disease. *Id.* Special Agent Fox asked Defendant what had caused his issues that day. *Id.* Defendant answered that he "drank too much, Xanax maybe, I don't know." *Id.* Special Agent Fox asked Defendant whether Defendant would test positive for heroin, and Defendant responded, "No." *Id.* Officer Regan asked Defendant when he last used methamphetamine and whether he was awake most of the night. *Id.* Defendant responded that he was awake most of the night. Gov't's Ex. 3A at TS 2:00. Special Agent Fox asked Defendant if he was cleared by rescue personnel. *Id.* at TS 3:40. Defendant answered that he was checked by rescue and cleared. *Id.* Special Agent Fox asked Defendant if what happened to him in the hotel room had ever happened before. *Id.* Defendant replied, "No," and stated that he passed out. *Id.*

Special Agent Fox then advised Defendant that law enforcement found approximately two ounces of methamphetamine and related drug paraphernalia in his hotel room. *Id.* at TS 4:40. Officer Regan asked Defendant if there was anything else in the room. Gov't's Ex. 3A at TS 5:13. Defendant responded that there were no other illegal narcotics in the room. *Id.* Defendant

admitted, however, that there was a firearm inside a locked bag in the room. *Id.* Defendant also disclosed from whom he acquired the two ounces of methamphetamine. *Id.* at 8:00.

Special Agent Fox informed Defendant that he could provide consent to search the hotel room or Officer Regan could apply for a search warrant. *Id.* at 10:06. Special Agent Fox told Defendant it was his decision. *Id.* Special Agent Fox reminded Defendant that he had previously been asked by VBPD officers to grant consent for a search of the room and declined to provide consent. *Id.* Special Agent Fox informed Defendant that he could deny consent again. After Officer Regan explained that she would apply for a search warrant based on Defendant's admission that there was a gun in the room, Defendant responded, "You got consent." Gov't's Ex. 3A at TS 11:10. Pursuant to Defendant's consent, the VBPD searched Room 423 and seized a firearm, a bag containing approximately two ounces of methamphetamine, and related drug paraphernalia. Gov't's Resp. Opp'n at Ex. 1, 2; Gov't Ex. 4–9.

### III. LEGAL STANDARD

In the course of deciding a motion to suppress, the district court may make findings of fact, as well as rulings of law. *United States v. Stevenson*, 396 F.3d 538, 541 (4th Cir. 2005). "At a hearing on a motion to suppress, the credibility of the witness and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. McKneely*, 6 F.3d 1447, 1452–53 (10th Cir. 1993) (quoting *United States v. Walker*, 933 F.2d 812 (10th Cir. 1991)). *See also Columbus-Am. Discovery Group v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 567 (4th Cir. 1995) ("In the usual case, the fact finder is in a better position to make judgments about the reliability of some forms of evidence than a reviewing body acting solely on the basis of a written record of that evidence. Evaluation of the credibility of a live witness is the most obvious

example.") (quoting *Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602 (1993)). As a general rule, the burden of proof is on the defendant who seeks to suppress the evidence. *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981). Once the defendant establishes a basis for his motion to suppress, the burden shifts to the government to prove by a preponderance of the evidence that the challenged evidence is admissible. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Matlock*, 415 U.S. 164, 177–78 (1974).

### IV. DISCUSSION

#### A. Standing

The Court finds that Defendant has standing to challenge the admissibility of the two-ounce bag of methamphetamine because he had a reasonable expectation of privacy in the hotel room. It is well established that a defendant must have a legitimate expectation of privacy in the evidence searched or seized to have standing to challenge the admissibility of the evidence. *Rawlings v. Kentucky*, 448 U.S. 98, 104–06 (1980). "No less than a tenant of a house, or the occupant of a room in a boarding house, a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures." *Stoner v. State of Cal.*, 376 U.S. 483, 490 (1964) (internal citations omitted). Furthermore, an individual's "status as an overnight guest is alone sufficient to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990).

In this case, Defendant had a reasonable expectation of privacy in the hotel room in which he was staying, regardless of the fact that another individual, H.S., booked the room. *See United States v. Williams*, 521 F.3d 902, 906 (8th Cir. 2008) ("The fact that [the defendant] did not register or pay for the hotel room does not necessarily preclude him from having a reasonable

expectation of privacy in the room.") (citing *United States v. Jeffers*, 342 U.S. 48, 50–52 (1951)). For these reasons, the Court finds that Defendant has standing to bring this Motion.[1]

**B.     Unlawful Search and Seizure**

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. Generally, absent an exception, evidence seized in violation of the Fourth Amendment is subject to suppression under the exclusionary rule. *See United States v. Calandra*, 414 U.S. 338, 347–48 (1974). Under the exclusionary rule, all evidence obtained in violation of the Fourth Amendment must be excluded for the protection of a defendant's constitutional rights and to deter Government violations. *See Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 363, (1998) (holding that the exclusionary rule is a prudential rule created by this Court to "compel respect for the constitutional guaranty") (citing *Elkins v. United States*, 364 U.S. 206, 217 (1960)); *see also Davis v. United States*, 564 U.S. 229, 236 (2011); *United States v. Calandra*, 414 U.S. 338, 348 (1974).

There are four relevant exceptions to the exclusionary rule in this case: (1) plain view; (2) exigent circumstances; (3) consent; and (4) inevitable discovery. Regarding the plain view, exigent circumstances, and consent exceptions, the Court does not need to address these exceptions in great detail because, even if the Government failed to prove these exceptions, the two-ounce bag of methamphetamine is admissible under the inevitable discovery exception. In short, however, the record is not clear on why so many officers were in Room 423 after the room was "frozen." There is also conflicting evidence regarding the definition of "frozen" and whether

---

[1] The Court finds the Government's argument that Defendant does not have standing because he abandoned ownership of all methamphetamine in the room unpersuasive. *See* Gov't's Mem. in Opp'n at 11. In making its argument, the Government relies on a statement Defendant made during a custodial interrogation that took place before Defendant was Mirandized. Gov't's Ex. 1A at TS 23:50. Thus, the Government cannot rely on the statement to support their argument. *See United States v. Leshuk*, 65 F.3d 1105, 1108 (4th Cir. 1995) ("[A]ny statements a suspect makes during custodial interrogation are inadmissible in the prosecution's case in chief unless prior Miranda warnings have been given.").

other police officers were permitted to enter the room after Officer Astin froze the scene and before Defendant gave consent. *Compare* Gov't's Ex. 1A at TS 9:25 (stating "make sure no one comes in or out of here") *and* Gov't's Ex. 1A at 19:40 (stating that Defendant denied consent to search the room, so the "scene is frozen") *with* Tr. at 25:12–16 (stating that police are allowed in the room even though it is "frozen"). While the record supports that Officers Beaton and Buckham were in the room on two different occasions to locate a shirt for one of the children, the record does not reflect a reliable explanation for why Officer Beaton entered the room a third time or why Sergeant Coffrin, Officer Santos, or any other police were in the room. But, to the extent that the above renders the VBPD's actions in violation of Defendant's Fourth Amendment rights, for the reasons below, the two-ounce bag of methamphetamine is admissible under the inevitable discovery exception.

The inevitable discovery doctrine states that evidence may not be suppressed if the government establishes by a preponderance of the evidence that law enforcement would have "ultimately or inevitably" discovered the evidence by "lawful means." *Nix v. Williams*, 467 U.S. 431, at 444 (1984); *see also Utah v. Strieff*, 579 U.S. 232, 238 (2016) (holding that the inevitable discovery doctrine "allows for the admission of evidence that would have been discovered even without the unconstitutional source"). "Lawful means" includes a search warrant based on probable case. *United States v. Allen*, 159 F.3d 832, 840–41 (4th Cir. 1998). The government must produce evidence, however, "that the police would have obtained the necessary warrant absent the illegal search." *Id.* at 841. The government can establish this by showing that the police did in fact execute a valid search warrant based on non-illegally obtained evidence or that the police "took steps to obtain a warrant prior to the unlawful search." *Id.* (citing *United States v. Lamas*, 930 F.2d 1099, 1103 (5th Cir.1991)). Thus, "[t]he existence of probable cause for a

10

warrant, in and of itself and without any evidence that the police would have acted to obtain a warrant, does not trigger the inevitable discovery doctrine any more than probable cause, in and of itself, renders a warrantless search valid." *Id.* at 841.

In this case, the Government has met its burden of establishing that the two-ounce bag of methamphetamine would have been inevitably discovered pursuant to a search warrant. Officer Astin explicitly told Defendant that absent Defendant's consent, he needed to "freeze the scene"—which he did immediately after Defendant was assisted out of the room—and apply for a search warrant. Officer Astin then explained that, if the warrant application is approved, the VBPD would "search the room anyway" based on the pipes, torch, and other drug paraphernalia Officer Astin observed in Defendant's room. Officer Astin then informed Defendant that he was being detained. Accordingly, the inevitable discovery doctrine applies because the VBPD took steps to obtain a warrant prior to the search. *See Allen*, 159 F.3d at 841 (citing *Lamas*, 930 F.2d at 1103); *Lamas*, 930 F.2d at 1103 (holding that the police took steps to obtain a warrant by "securing" the scene and detaining relevant parties until a warrant could be secured). Therefore, even if the Government failed to establish that the plain view, exigent circumstances, and consent exceptions to the warrant requirement applied in this case, the bag of methamphetamine is admissible via inevitable discovery.

### IV. CONCLUSION

For the reasons stated above, Defendant's Motion to Suppress is **DENIED**.

The Clerk is **DIRECTED** to send a copy of this Memorandum Opinion and Order to the parties and counsel of record.

**IT IS SO ORDERED.**

Norfolk, Virginia
April /8/, 2022

/s/
Raymond A. Jackson
United States District Judge

11